Walker G. Harman, Jr. [WH-8044]
THE HARMAN FIRM, P.C.
19 Fulton Street, Suite 408
New York, New York 10038
212-425-2600
*Attorneys for Plaintiff*



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------X

LES KRAMSKY,

                                *Plaintiff,*

          -against-

CHETRIT GROUP LLC, JOSEPH CHETRIT,
JUDA CHETRIT, MEYER CHETRIT, and
JACOB CHETRIT

                                *Defendants.*
-------------------------------------------------------------------------X

10-CV-02638 (HB)

**FIRST AMENDED**
**COMPLAINT**

PLAINTIFF
HEREBY
DEMANDS A
TRIAL BY JURY

Plaintiff, LES KRAMSKY, by his attorneys, THE HARMAN FIRM, P.C., as and

for his Complaint against Defendant alleges as follows:


**PARTIES, JURISDICTION AND NATURE OF ACTION**

1.       Plaintiff, LES KRAMSKY, a citizen of New Jersey, was subjected to

religious discrimination, retaliation for raising his rights under New York State Labor

Law, violations of New York State Labor Law for wages owed, promissory estoppel and

breach of contract.

2.     Defendant, CHETRIT GROUP, LLC (Herein after "CHETRIT LLC") is a private company authorized to do business in New York, located at 404 5th Avenue, New York, New York.

3.     Defendant JOSEPH CHETRIT is Managing Member of CHETRIT LLC, and was an individual that Plaintiff KRAMSKY reported to.

4.     Defendant MEYER CHETRIT is a partner of CHETRIT LLC, was an individual that Plaintiff KRAMSKY reported to.

5.     Defendant JUDA CHETRIT is a partner of CHETRIT LLC, was an individual that Plaintiff KRAMSKY reported to.

6.     Defendant JACOB CHETRIT is a partner of CHETRIT LLC, was an individual that Plaintiff KRAMSKY reported to.

7.     Plaintiff KRAMSKY was offered the position of General Counsel by Defendant CHETRIT LLC on or about February 11, 2009, but began working for Defendant CHETRIT LLC as General Counsel on April 20, 2009, earning a salary of $150,000 with a promised bonus of $30,000.

8.     Following a pattern of religious discrimination, harassment and retaliation, Plaintiff KRAMSKY was terminated from his position on January 20, 2010.

9.     Plaintiff KRAMSKY was terminated in violation of New York City Administrative Code § 8-502(a), *et. seq.*, New York City Administrative Code § 17-504 (2), New York Labor Law § 740 (2)(a), New York State Labor Law, § 198, *et. seq.*, promissory estoppel, and breach of contract.

2

10.     During the tenure of Plaintiff KRAMSKY'S employment, he worked in a hostile work environment where religiously offensive and pejorative comments were routinely made to him.

11.     As well, Plaintiff KRAMSKY was subjected to a number of violations of New York City law and practice, including, but not limited to, smoking in the office place and retaliation for complaining about it in violation of New York State Labor Law § 17-504(a).

12.     Moreover, Plaintiff KRAMSKY was retaliated against for stating that he would approach the New York State Department of Labor and other governmental offices in regard to Defendant CHETRIT LLC'S wanton violations of New York State labor laws.

13.     This action seeks compensatory and punitive damages for Defendants' violations of New York City Administrative Code § 8-502(a), *et. seq.*, New York City Administrative Code § 17-504 (2),  New York Labor Law § 740 (2)(a), New York State Labor Law, § 198, *et. seq.*, promissory estoppel, and breach of contract.

## VENUE AND JURISDICTION

14.     Jurisdiction of this Court is proper under USC 28, § 1332 (a) in that the matter in controversy exceeds the sum or value of $75,000, and is between citizens of different States.

15.     Venue is properly laid in the Southern District of New York under U.S.C. § 1391(a)(2), in that a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

## JURY DEMAND

16.     Plaintiff KRAMSKY respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## BACKGROUND

17.     Plaintiff LES. R. KRAMSKY is an extremely capable and successful real estate attorney, who had his own practice for over eighteen (18) years. Upon the promises and representations made by Defendant CHETRIT LLC, Plaintiff gave up his lucrative practice to become General Counsel for Defendant CHETRIT LLC.

18.     Defendant CHETRIT is a multi-million dollar real estate company, based in New York City. Defendant CHETRIT owns a number of buildings in and around New York City and all over the United States, including owning a significant portion of the Scars Tower in Chicago.

19.     On January 30, 2009, Plaintiff KRAMSKY received an email from Defendant CHETRIT LLC in reply to Plaintiff KRAMSKY'S resume that had been posted on the Internet, stating that Defendants were "...seeking a full time in-house Real Estate Attorney with at least 3 years minimum experience....".

20.     Plaintiff KRAMSKY interviewed with Defendant CHETRIT LLC on or about February 11, 2009.  During this meeting, Plaintiff KRAMSKY was offered the Position of General Counsel for Defendant CHETRIT LLC by Defendant JOSEPH CHETRIT. At no time during the interview did Defendants state that they were looking for a part time or contract attorney; it was made clear by Defendants that they were seeking a full time attorney solely to focus on real estate transactional work.

4

21.     However, due to delays and stalling on the part of Defendant JOSEPH CHETRIT, Plaintiff KRAMSKY was not able to begin his employment with Defendant CHETRIT LLC until April 20, 2009.

22.     On March 31, 2009, per Defendant JOSEPH CHETRIT's request, Plaintiff KRAMSKY put together an Employment Agreement stating the terms of his compensation and emailed it to Defendant JOSEPH CHETIRT with his signature. Defendant JOSEPH CHETRIT never returned an executed copy to Plaintiff KRAMSKY. Defendant JOSEPH CHETRIT stated that he wanted to reflect in the agreement that for the first ninety (90) days, Plaintiff KRAMSKY would be paid as a 1099 employee, but then after the ninety (90) days, would be switched to a W-2 employee and would be put on the company's health insurance. This is all reflected in the Employment Agreement.

23.     Both parties had agreed to these terms, even though Defendant JOSEPH CHETRIT did not return an executed copy back to Plaintiff KRAMSKY. Further, the Defendants referenced the employment agreement and the provisions it contained numerous times in conversations and actions in the workplace, indicating that the Defendants believed the agreement was binding on the parties.

24.     The agreement, dated March 31, 2009, states that Plaintiff KRAMSKY would assume the position of General Counsel, effective April 7, 2009. Plaintiff KRAMSKY would be compensated one hundred and fifty thousand dollars ($150,000) per year for his role at Defendant CHETRIT LLC. Plaintiff KRAMSKY accepted this reduced amount (meaning lower than he made in his private practice) in that Defendants indicated that employment with Defendant CHETRIT LLC would be increasingly

rewarded the longer Plaintiff KRAMSKY was with Defendant CHETRIT LLC, including future bonuses and other compensation.

25.    The contract continues on to state that Plaintiff KRAMSKY is entitled to a bonus of thirty thousand dollars ($30,000) after one year of employment with Defendant CHETRIT LLC. It was also agreed in the contract that Plaintiff KRAMSKY would have ten (10) sick days and ten (10) vacation days per calendar year.

26.    The contract also states that Plaintiff KRAMSKY and Defendant CHETRIT LLC agree to a "trial period of ninety (90) days. In the event that General Counsel's (Plaintiff KRAMSKY) employment continues beyond the ninety (90) day trial period, Employer agrees to provide medical insurance, dental insurance, and other benefits to General Counsel." The employment agreement continues, stating, "In the event that General Counsel's (Plaintiff KRAMSKY) employment continues beyond the ninety (90) day trial period, General Counsel will then become a W-2 employee".

27.    During the interview, Defendant JOSEPH CHETRIT promised Plaintiff KRAMSKY that he would definitely be on their health insurance plan after ninety (90) days. Plaintiff KRAMSKY advised Defendant JOSEPH CHETRIT that he would speak with his accountant and get back to him with regards to Plaintiff KRAMSKY'S paycheck and withholdings.    In an email sent by Plaintiff to Defendant CHETRIT LLC, dated March 6, 2009, Plaintiff KRAMSKY informed Defendant JOSEPH CHETRIT that his accountant advised him that as a full-time employee, Plaintiff KRAMSKY must be paid as a W-2 employee.  Plaintiff KRAMSKY also advised Defendant JOSEPH CHETRIT that he was fine with waiting 90 days for my company health insurance.

28.     During the Interview, Plaintiff KRAMSKY alerted Defendants JOSEPH CHETRIT and JACOB CHETRIT of his concern that he was giving up his law practice of over 18 years. Plaintiff KRAMSKY reiterated his concerns regarding his lucrative real estate practice, in that Plaintiff KRAMSKY would only be interested dissolving his practice if the position with the Defendant CHETRIT LLC was a long-term career opportunity.

29.     Plaintiff KRAMSKY was advised by Defendant JOSEPH CHETRIT not to worry about dissolving his real estate practice, and promised that it was a long-term position.[1]

30.     Plaintiff KRAMSKY relied on the promises made by Defendants, and began to shut down his practice.

31.     Satisfied with the terms of the Employment Agreement, and Defendant JOSEPH CHETRIT'S promises towards Plaintiff KRAMSKY regarding his employment with Defendant CHETRIT LLC, Plaintiff KRAMSKY accepted the Employment Agreement, and reported to work on or about April 20, 2009 as General Counsel for Defendant CHETRIT LLC.

32.     During Plaintiff KRAMSKY'S employment with Defendant CHETRIT LLC, he was provided with his own office, his own email address on the company's server and domain, his own mail box, a direct phone line, was expected to keep regular

---

[1] Furthermore, Defendant JOSEPH CHETIRT stated that since Defendant CHETRIT LLC never gets rid of employees, and stated that almost all of their employees have been with Defendant CHETRIT for several years. This was the most important reason Plaintiff KRAMSKY accepted the position and gave up his law practice, which brought in between $200,000 and $300,000 per year.

hours at the office, and was under the direct control of the   Partners and other employees of Defendant CHETRIT LLC.

33.      As General Counsel, Plaintiff KRAMSKY also appeared listed with his title on the letterhead for Defendant CHETRIT LLC, and carried out real estate transactions with clients, building owners and tenants as a representative for Defendant CHETRIT.

## HEALTH INSURANCE, W-2 INCOME AND RETALIATION

34.      After ninety (90) days of employment with Defendant CHETRIT LLC, on or about July 21, 2009, Plaintiff KRAMSKY advised Defendants JOSEPH and MEYER CHETRIT that ninety (90) days expired and per the Employment Agreement, he was to be paid as a W-2 employee and placed on the Defendant CHETRIT LLC'S health insurance plan. Defendants JOSEPH and MEYER CHETRIT refused, despite Plaintiff KRAMSKY urging.

35.      Defendants JOSEPH and MEYER CHETRIT said they would reimburse Plaintiff KRAMSKY each month for his personal health insurance policy plan. Defendants JOSEPH and MEYER CHETRIT said they wanted to continue to pay Plaintiff KRAMSKY as a 1099 employee, in complete contradiction with the fact of both Plaintiff KRAMSKY'S employment agreement with Defendant CHETRIT LLC and the fact that he was a full-time, in house member of Defendant CHETRIT LLC and was therefore an employee and not an independent contractor.

36.      As evidenced by several emails between the involved parties, Plaintiff KRAMSKY was forced to continually beg and request reimbursements for health insurance from Defendants JUDAH and MEYER CHETRIT. Plaintiff KRAMSKY

verbally informed Defendant MEYER CHETRIT on several occasions that he does not have to beg for his health insurance reimbursement each month.

37.     Plaintiff KRAMSKY advised Defendant MEYER CHETRIT that, per the Employment Agreement and per New York State law, that he wanted to be paid as a W-2 employee and be on the company health insurance plan.  Defendant MEYER CHETRIT ignored his many requests. Plaintiff KRAMSKY'S requests were made to Defendant MEYER CHETRIT on or about July 21, July 28, August 6, September 8, September 22, October 20, October 23, October 27, October 30, November 17, and December 22, 2009.

38.     Plaintiff KRAMSKY also made repeated oral and written requests to Defendant JUDA CHETRIT on or about January 5, January 15, January 18, January 19, January 20, January 21 and January 22, 2010, to become a W-2 employee and to be put on the company's health insurance plan.

39.     On or about January 18, 2010 Plaintiff KRAMSKY was still owed health insurance reimbursement for January for $1,784.15 representing one months worth of payments overdue, with a February health insurance reimbursement for $1,784.15 was due.  Plaintiff KRAMSKY was still also owed for a sick day from October 22nd for $576.92, with the total amount owed to Plaintiff KRAMSKY being $4,145.22.

40.     On January 19th, Plaintiff KRAMSKY verbally requested that Defendant JUDA CHETIRT pay him the monies that were owed to him.  Plaintiff KRAMSKY advised him that he did not want to beg for his health insurance reimbursements anymore and that he needed to be paid as a W-2 employee pursuant to New York State Law and the agreement when he was hired.

9

41.     Plaintiff KRAMSKY advised Defendant JUDA CHETRIT that he needed to be put on the company's health insurance plan pursuant to New York State Law and according to the terms of the Employment Agreement between Plaintiff KRAMSKY and Defendant CHETRIT.  Plaintiff KRAMSKY further advised Defendant JUDA CHETRIT that if this were not done by Friday, January 22, 2010 then he would file a complaint with the New York State Labor Department.

42.     Following Plaintiff KRAMSKY'S threat, Defendant JUDA CHETRIT again promised Plaintiff KRAMSKY that he would be reimbursed the next day.  Plaintiff KRAMSKY reminded him that on Friday, January 15, 2010 Defendant JUDA CHETRIT promised Plaintiff KRAMSKY he would be reimbursed on Monday, January 18, 2010, and that Defendant JUDA CHETRIT stated on January 18, 2010 that he would be reimbursed on Tuesday, January 19, 2010.  Clearly, Defendant JUDA CHETRIT had no intention of following through on his promises to reimburse Plaintiff KRAMSKY, nor had he any intention to honor Defendant CHETRIT LLC'S contractual promise to pay Plaintiff KRAMSKY as a W-2 employee.

43.     On the mornings of January 20, January 21 and January 22, 2010, Plaintiff KRAMSKY again reminded Defendant JUDA CHETRIT that he was going to submit a complaint to the Labor Department, as he was tired of having to beg for the promised reimbursements and coupled with the fact that Plaintiff KRAMSKY was wrongfully being treated as a 1099 employee without being on the company's health insurance plan, all of which had been agreed to before beginning employment with Defendant CHETRIT LLC.

44.     On or about January 22, 2010, Defendant JOSEPH CHETRIT called Plaintiff KRAMSKY into his office and told Plaintiff KRAMSKY he was to be terminated.   Plaintiff KRAMSKY was given one-week severance, and was paid for January's health insurance reimbursement.

45.     Plaintiff KRAMSKY'S termination is clearly in retaliation for threatening to raise his rights under New York State Law, and the threat of a formal complaint with the New York State Department of Labor.   Just one day after threatening to raise his rights in a conversation with Defendant JUDA CHETRIT, Plaintiff KRAMSKY was terminated, demonstrating that Plaintiff CHETRIT LLC had clearly made the decision to terminate Plaintiff KRAMSKY before he would be able to report Defendant CHETRIT LLC'S illegal labor practices.

46.     Plaintiff KRAMSKY was clearly an employee of Defendant CHETRIT LLC, and was intentionally misidentified as a 1099 contract worker. Among the evidence for Plaintiff KRAMSKY to be considered an employee are as follows:

- Plaintiff was recruited by Defendant CHETRIT LLC to be a full time In-House Attorney.
- Plaintiff's agreement stated that after 90 days he would be a W-2 employee.
- Plaintiff had his company email account.
- Plaintiff had his own direct telephone line.
- Plaintiff had his own mail slot.
- Plaintiff had his own office
- Plaintiff worked at the office every day from 9 am to 5 pm.
- Plaintiff was under the direct control and supervision of the partners.
- Plaintiff's computer generated letterhead stated the employer's name and on the side his name as General Counsel.

## RELIGIOUS DISCRIMINATION

47.     On or about February 17, 2009, Plaintiff KRAMSKY interviewed with Defendants JUDAH and JACOB CHETRIT.  During the interview, Plaintiff KRAMSKY

mentioned that his son's Bar Mitzvah was coming up soon, and that he would like to finalize employment details soon as this was an extremely important event. Defendant JOSEPH CHETRIT then mentioned in Hebrew to his brother, Defendant JACOB CHETRIT that Plaintiff KRAMSKY was Jewish. Upon information and belief, Plaintiff KRAMSKY states that that this was a main reason why he was hired, and that Defendants JOSEPH CHETRIT and JACOB CHETRIT believed that Plaintiff KRAMSKY was an Orthodox Jew.

48.     After Plaintiff KRAMSKY commenced his employment in April of 2009, Simon Chetrit, the father of the partners, came into Plaintiff KRAMSKY'S office and asked if he spoke Hebrew. After Plaintiff KRAMSKY advised him that he did not, Mr. Chetrtit never spoke to Plaintiff KRAMSKY again, solely due to the fact that he was not Orthodox and did not speak Hebrew.

49.     In June of 2009, Plaintiff KRAMSKY was asked by Defendant MEYER CHETRIT what Temple he belonged to and whether it was an Orthodox Temple. Defendant MEYER CHETRIT then asked if the men and women sit together or not. Plaintiff KRAMSKY advised him that the men and women do sit together because he is not Orthodox.

50.     Once it was discovered that Plaintiff KRAMSKY was not Orthodox, the partners treated him differently. Certain work, projects and assignments that would normally be assigned to Plaintiff KRAMSKY were now sent to outside, Orthodox Jewish counsel. Even simple real estate matters that Defendants knew Plaintiff KRAMSKY was more than capable of handling were no longer being given to him. Plaintiff KRAMSKY

was no longer included in the meetings amongst the Partners since Plaintiff KRAMSKY was not part of their Orthodox community.

51.     Solely because of the discrimination, Plaintiff KRAMSKY was never trusted with blank checks or with power of attorney for closings, which is standard procedure when the client or buyer is not appearing at the closing.   On or about September of 2009, Plaintiff KRAMSKY requested blank checks and a power of attorney from Defendant MEYER CHETRIT, as he was not attending the closing.   Defendant MEYER CHETRIT refused Plaintiff KRAMSKY'S requests, and Plaintiff KRAMSKY advised him that he would then need to go to the closing.   Plaintiff KRAMSKY also reminded him that he is an attorney and throughout his twenty (20) years of practice, he was given blank checks and power of attorney from clients.

52.     Due to the discrimination, Plaintiff KRAMSKY states that he was always second-guessed on the decisions he made while employed at Defendant CHETRIT LLC, while the Orthodox Jewish investors, outside Orthodox attorneys and the Orthodox employees were always trusted with routine business-related decisions.

53.     Plaintiff KRAMSKY states that Defendant CHETRIT LLC would second-guess his impeccable legal work with non-attorneys, but who were Orthodox.   Further, Plaintiff KRAMSKY states that everyone he did business with such as outside counsel, opposing counsel, and other employees never had any complaints about his legal work and that he is a very experienced real estate attorney.   Plaintiff KRAMSKY strongly believes that he was discriminated against treated differently, and not trusted because he was not Orthodox.

13

54.     On or about August 5, 2009, Plaintiff KRAMSKY prepared security instruments for a private loan and after these documents were revised by himself and opposing counsel and agreed to, Defendant JOSEPH CHETRIT decided that his documents were not detailed enough in his lay person's opinion, and clauses were added by Defendant JOSEPH CHETRIT, clauses that did not make sense to Plaintiff KRAMSKY from a legal perspective.

55.     Defendant JOSEPH CHETRIT then made Plaintiff KRAMSKY give the documents to Defendant CHETRIT LLC'S Orthodox outside counsel to review.  This Orthodox attorney deleted all of the items that Defendant JOSEPH CHETRIT had added, and made it to appear that Plaintiff KRAMSKY had made those additions.  This incident very embarrassing to Plaintiff KRAMSKY in that his documents were perfect and already agreed to by all parties involved.  Plaintiff KRAMSKY believes that Defendant JOSEPH CHETRIT had no confidence in Plaintiff KRAMSKY'S legal ability because he was not Orthodox Jewish, which is evidenced in Defendants JOSEPH CHETRIT and MEYER CHETRIT'S continual insistence that all work be checked by his Orthodox legal counsel.

56.     On or about November of 2009, in a meeting for a transaction, Defendant CHETRIT LLC had assembled a meeting of all Orthodox parties.  Whenever the group did not want Plaintiff KRAMSKY to hear something, they would switch from English to Hebrew.  This made Plaintiff KRAMSKY feel like he was being treated differently because he was not Orthodox and did not speak Hebrew.

57.     Whenever Plaintiff KRAMSKY advised Defendants on a legal issue, Defendants would always double check with their Orthodox outside counsel even though

his advice was always correct. This caused Plaintiff KRAMSKY again to feel like he was being treated differently simply because he is not Orthodox Jewish.

58.     Upon information and belief, the only parties close to the partners and trusted by the partners are Orthodox Jewish, including their two main project managers, a high level office person, real estate outside counsel, an outside accountant, the main contractor, an insurance person, and including all of the investor partners.

59.     Plaintiff KRAMSKY states that there was an Orthodox rabbi that came to the office all of the time. Every time the Rabbi saw Plaintiff KRAMSKY, he requested that he put on tefillen, which is an Orthodox Jewish ritual. Plaintiff KRAMSKY would advise him that during work he was not comfortable practicing religion. Nevertheless, the Rabbi would always ask Plaintiff KRAMSKY to put on tefillen and pray, making him feel very uncomfortable. He did not do this to the other Orthodox Jewish people in the office.

60.     Plaintiff KRAMSKY found himself constantly at odds with Defendants as a result of him not practicing Orthodox Judaism like the rest of Defendant CHETRIT LLC'S owners and key employees.

61.     Plaintiff KRAMSKY'S religion became a source of contention between himself and the Defendants, and led to his eventual unlawful termination from Defendant CHETRIT LLC.

## SMOKING

62.     While employed at Defendant CHETRIT LLC, Plaintiff KRAMSKY was subjected to second hand smoke from other employees while in the office, a policy that was explicitly endorsed by the Partners of Defendant CHETRIT LLC.

63.     Plaintiff KRAMSKY advised MEYER, JACOB, and JUDA CHETRIT on several occasions that smoking in the office was illegal and it offended him. Plaintiff KRAMSKY advised them that it made him sick, gave him headaches and it made his clothes smell disgusting.

64.     Plaintiff KRAMSKY was rebuffed following his complaints, with the Defendants stating that they own the building and they were permitted to do what they wanted in their building. Plaintiff KRAMSKY advised them that whether they own the building or not, smoking is banned from all public buildings in New York. The smoking in the office continues on a daily basis.

65.     On or about October 30th, 2009, Plaintiff KRAMSKY was called into Defendant JUDA CHETRIT's office, where he was smoking with Defendant MEYER CHETRIT in the office. Plaintiff KRAMSKY advised them that the smoking bothered him, and that it was illegal to smoke in the office.

66.     On November 17, 2009, Plaintiff KRAMSKY had a very bad headache from the smoking in the office and again complained to Defendant MEYER CHETRIT who did nothing.

67.     Defendant CHETRIT LLC, and the Partners have clearly established the office as an unsafe environment, and permitted behavior that violated New York City Administrative Code § 17-504(a).

68.     Further, Defendants retaliated against Plaintiff KRAMSKY for his complaints against the constant smoking in the workplace, resulting in his eventual termination following a series of complaints made against Defendant CHETRIT LLC, threatening to report them to the New York State Board of Labor.

## ETHICS VIOLATIONS/FINANCIAL IMPROPRIETY

69.    Plaintiff KRAMSKY also found himself the victim of Defendant CHETRIT LLC after he refused to represent the company in a real estate closing when Defendants were lying to the short sale lender in that they were buying the property for only $150,000, rather than the real price of $250,000.

70.    Defendants JOSEPH, JACOB, MEYER and JUDA CHETRIT were upset with Plaintiff KRAMSKY because he was "too ethical" for them, and they advised Plaintiff KRAMSKY that it was no big deal to lie to a short sale lender about the purchase price.

71.    Plaintiff KRAMSKY believes that his refusal to represent Defendant CHETRIT LLC in connection with the short sale of this property, which violated Plaintiff KRAMSKY'S ethical standards, contributed to the decision to terminate Plaintiff KRAMSKY'S employment with Defendant CHETRIT LLC.

72.    In another incident, Defendant MEYE CHETRIT and Gadi Ben Hamo requested that Plaintiff KRAMSKY provide them a letter to give to lenders, realtors and sellers stating that Plaintiff KRAMSKY was holding 5 million dollars of their money to be used to buy properties in his Attorney Escrow Account so that the letter could be fraudulently used as a "proof of funds" letter.

73.    In fact, Plaintiff KRAMSKY was not holding any of their monies in his Attorney Escrow Account, and as such, Plaintiff KRAMSKY refused to provide them with this letter. Plaintiff KRAMSKY's refusal to not fall in line with Defendant CHETRIT LLC'S incredibly deceitful and ethically questionable decision was a factor

also contributed to the decision to terminate Plaintiff KRAMSKY'S employment with Defendant CHETRIT LLC.

74.     Plaintiff KRAMSKY also recalls incidents while employed at Defendant CHETRIT LLC where Defendants were stealing from their real estate partners by writing checks to either fictitious contractors or vendors or writing checks to themselves, but labeling it in their records as payment to the contractors or vendors. Plaintiff KRAMSKY refused to take part in such activity while employed with Defendant CHETRIT LLC.

75.     Defendant CHETRIT LLC and all individually named Defendants also took monies that were to be held in reserve for construction costs, tenant reserves or for other reserve funds relating to building management, and used the monies for their own personal use.  This included using these funds to pay bonuses, and in one instance to pay off an employee's student loan, but continued to advise their lender and their outside partners that these monies were used for construction projects.

76.     Plaintiff KRAMSKY claims that Defendants JOSEPH, JACOB, JUDA and MEYER CHETRIT have also made improper withdrawals from the lender's emergency reserve fund, and have made other suspect requests for construction money.

77.     In addition, Defendants JOSEPH, JACOB, JUDA and MEYER CHETRIT have also unlawfully taken monies from many tenant reserve funds.  This all evidences fraud, misrepresentation and negligence.

78.     Plaintiff KRAMSKY knowledge of these acts and omissions by Defendants, coupled with Plaintiffs threats to file formal complaints with the New York State

Department of Labor and other oversight organizations, among other illegal conduct, led to Plaintiff's termination from Defendant CHETRIT LLC.

## FIRST CAUSE OF ACTION

### Promissory Estoppel

79.　Plaintiff KRAMSKY repeats and re-alleges each and every allegation contained in paragraphs "1" through "78" with the same force and affect as if separately alleged and reiterated herein.

80.　Defendants promised to give Plaintiff a long-term position as General Counsel and further promised to provide bonuses and increased salary and other compensation over time.

81.　Defendants know that Plaintiff would be shutting down his own lucrative real estate practice in New Jersey in order to accept a position with Defendants.

82.　Defendants knew that Plaintiff would shut down his own private practice in New Jersey and New York in reliance on the promises to provide Plaintiff with a long-term, full time position in New York as General Counsel.

83.　The Plaintiff actually relied on the promise of full time employment in that plaintiff shut down his own private practice and accepted a position as General Counsel at Defendant CHETRIT LLC.

84.　Non-enforcement of the promise caused Plaintiff detrimental injury in that Defendants discriminated against Plaintiff, terminated him from him long-term position as General Counsel for no legitimate business reason, leaving Plaintiff with no income due to the fact that he had shut down his own private practice.

85.   As a result of Defendants' actions, Plaintiff KRAMSKY has suffered irreparable injuries, including but not limited to loss of pay, benefits and other economic losses, emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity and other intangible injuries for all of which she should be compensated.

## SECOND CAUSE OF ACTION

### Religious Discrimination

86.   Plaintiff KRAMSKY repeats and re-alleges each and every allegation contained in paragraphs "1" through "78" with the same force and affect as if separately alleged and reiterated herein.

87.   Defendants routinely discriminated against Plaintiff KRAMSKY on the basis of his religion, and specifically by not practicing Orthodox Judaism as did the rest of the owners of Defendant, all in violation of New York City Administrative Code §8-502(a), *et. seq.*   Plaintiff was continually second guessed and not afforded the same level of responsibility, trust, and work load as Orthodox employees and outside counsel while employed with Defendants.

88.   As a result of Defendants' actions, Plaintiff KRAMSKY has suffered irreparable injuries, including but not limited to loss of pay, benefits and other economic losses, emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity and other intangible injuries for all of which she should be compensated.

## THIRD CAUSE OF ACTOIN

### Smoking In the Workplace

89.   Plaintiff KRAMSKY repeats and re-alleges each and every allegation contained in paragraphs "1" through "78" with the same force and affect as if separately alleged and reiterated herein.

90.   Defendants discriminated against Plaintiff in the terms and conditions of his employment by forcing Plaintiff KRAMSKY to work in an office that permitted smoking, in violation of New York City Administrative Code § 17-504(a).

91.   As a result of Defendants' actions, Plaintiff KRAMSKY has suffered irreparable injuries, including but not limited to loss of pay, benefits and other economic losses, emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity and other intangible injuries for all of which she should be compensated.

### FOURTH CAUSE OF ACTION

### Retaliation for Complaints Against Smoking

92.   Plaintiff KRAMSKY repeats and re-alleges each and every allegation contained in paragraphs "1" through "78" with the same force and affect as if separately alleged and reiterated herein.

93.   Plaintiff KRAMSKY was retaliated against for complaining about the pervasive environment in the workplace that allowed employees to smoke within the office building, leading to his eventual termination. Such termination was in violation of New York City Administrative Code § 17-504 (2), which states that "protection from retaliatory adverse personnel action with respect to all employees or applicants for employment who exercise, or attempt to exercise, any rights granted under such subdivision: and (B) the establishment of a procedure to provide for the adequate

redress of any such adverse personnel action taken against an employee in retaliation for that employee's attempt to exercise his or her rights under this chapter with respect to the place of employment".

94.   As a result of Defendants' actions, Plaintiff KRAMSKY has suffered irreparable injuries, including but not limited to loss of pay, benefits and other economic losses, emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity and other intangible injuries for all of which she should be compensated.

## FIFTH CAUSE OF ACTION

### Failure to Pay Wages

95.   Plaintiff KRAMSKY repeats and re-alleges each and every allegation contained in paragraphs "1" through "78" with the same force and affect as if separately alleged and reiterated herein.

96.   Defendants repeatedly failed to pay Plaintiff KRAMSKY the wages he was owed, including unused vacation and sick days in violation of New York State Labor Law, §198, *et. seq.*

97.   Defendants repeatedly withheld payments from Plaintiff KRAMSKY, requiring Plaintiff KRAMSKY to continually ask and beg for the payments Defendants promised to make. Further, at the time of Plaintiff KRAMSKY'S termination, he was owed $4,145.22 in reimbursements.

98.   Further, Plaintiff KRAMSKY was entitled to 10 sick days and 10 vacation days per company policy and his Employment Agreement. Plaintiff KRAMSKY was never reimbursed for the unused 17 days in 2009.  As of January 1, 2010, Plaintiff

KRAMSKY was entitled 10 sick days and 10 vacation days, for which was never reimburse. Therefore, Plaintiff KRAMSKY was entitled to reimbursement for 38 workdays totaling $22,000. Plaintiff KRAMSKY is also entitled to his one-year bonus of $30,000, as Plaintiff KRAMSKY was intentionally terminated right before his year-end bonus was to be paid.

99. As a result of Defendants' actions, Plaintiff KRAMSKY has suffered irreparable injuries, including but not limited to loss of pay, benefits and other economic losses, emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity and other intangible injuries for all of which she should be compensated.

## SIXTH CAUSE OF ACTION

### Retaliation

100. Plaintiff KRAMSKY repeats and re-alleges each and every allegation contained in paragraphs "1" through "78" with the same force and affect as if separately alleged and reiterated herein.

101. Upon Defendants' failure to uphold their promise to make Plaintiff KRAMSKY a W-2 employee on January 19, 2010, Plaintiff KRAMSKY had threatened to go to the New York State Department of Labor regarding his incorrect and illegal classification as a W-2 employee. After making such claims, Plaintiff KRAMSKY was terminated a mere three days later, on January 22, 2010.

102. New York Labor Law § 740 (2)(a) states that "An employer shall not take any retaliatory personnel  action against an employee because such employee does any

of the following: (a) discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety".

103. Plaintiff KRAMSKY was terminated immediately following his complaints to Defendants regarding his employment status, and following his threats to go to the New York Department of Labor

104. As a result of Defendants' actions, Plaintiff KRAMSKY has suffered irreparable injuries, including but not limited to loss of pay, benefits and other economic losses, emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity and other intangible injuries for all of which she should be compensated.

## SEVENTH CAUSE OF ACTION

### Breach of Contract

105. Plaintiff KRAMSKY repeats and re-alleges each and every allegation contained in paragraphs "1" through "78" with the same force and affect as if separately alleged and reiterated herein.

106. Prior to commencing his employment with Defendant CHETRIT LLC, Plaintiff KRAMSKY was directed by Defendant JOSEPH CHETRIT to create an employment agreement, outlining the terms of his employment.

107. During the discussion regarding the employment agreement, Defendant JOSEPH CHETIRT stated he wanted to reflect in the agreement that for the first ninety (90) days, Plaintiff KRAMSKY would be paid as a 1099 employee, but then after the

ninety (90) days, would be switched to a W-2 employee and would be put on the company's health insurance.

108. Plaintiff KRAMSKY agreed to these terms, and sent a signed copy of the employment agreement to Defendant JOSEPH CHETRIT.

109. Following the commencement of his employment with Defendant CHETRIT LLC, the owners and Defendants made numerous references to the Employment Agreement, which references led Plaintiff KRAMSKY to believe that the contract was binding for all parties.

110. After ninety (90) days working with Defendant CHETRIT LLC, Plaintiff KRAMSKY inquired as to what the status of his transition from 1099 to W-2 employee was, as detailed in the Employment Agreement between Plaintiff KRAMSKY and Defendant CHETRIT LLC. Plaintiff KRAMSKY was informed that they would continue to treat him as a 1099 employee, in violation of the Employment Agreement.

111. Despite numerous complaints made by Plaintiff KRAMSKY, Defendant CHETRIT LCC failed to uphold their contractual obligation to make Plaintiff KRAMSKY a W-2 employee.

112. As a result of Defendants' actions, Plaintiff KRAMSKY has suffered irreparable injuries, including but not limited to loss of pay, benefits and other economic losses, emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity and other intangible injuries for all of which she should be compensated.

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

(i)     On the First Cause of Action, actual damages to be determined at trial, but in no event less than $2,000,000;

(ii)    On the Second Cause of Action, actual damages to be determined at trial, but in no event less than $1,000,000;

(iii)   On the Third Cause of Action, actual damages to be determined at trial, but in no event less than $1,000,000;

(iv)    On the Forth Cause of Action, actual damages to be determined at trial, but in no event less than $1,000,000

(v)     On the Fifth Cause of Action, actual damages to be determined at trial, but in no event less than $1,000,000

(vi)    On the Sixth Cause of Action, actual damages to be determined at trial, but in no event less than $1,000,000

(vii)   On the Seventh Cause of Action, actual damages to be determined at trial, but in no event less than $1,000,000

(viii)  Disbursements and other costs; and

(ix)    For such other and further relief which the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury.

Dated:      New York, New York
            April 16, 2010

                                        _____
                                        Walker G. Harman, Jr.
                                        THE HARMAN FIRM, PC
                                        *Attorneys for Plaintiff*
                                        19 Fulton Street, Suite 408
                                        New York, New York 10038
                                        (212) 425-2600

To:     Joseph Babchick, Esq
        Babchick and Young
        200 East Post Road
        White Plains, NY 10601
        914-470-0001